T.C. Memo. 2019-87

UNITED STATES TAX COURT

JANICE KAY HASKINS AND JULIAN WILLIAM HASKINS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25667-15.                    Filed July 11, 2019.

Janice Kay Haskins and Julian William Haskins, for themselves.

<u>Donielle A. Holmon</u> and <u>Horace Crump</u>, for respondent.

CONTENTS

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1.    Foreign-earned-income exclusions for 2011 and 2012 . . . . . . . . . . . . . . . . 13

2.    Deductions for business expenses for 2012 . . . . . . . . . . . . . . . . . . . . . . . 19

      a.    $1,100 for a metal brake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**[\*2]** b.   $264 for a paint sprayer and parts . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     c.   $194 for an air compressor and attachments . . . . . . . . . . . . . . . . . . 28

     d.   $489 for a power generator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

     e.   $54 for painting supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

     f.   $354 for circular saw blades . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     g.   $66 for reciprocating saw blade sets . . . . . . . . . . . . . . . . . . . . . . . . 32

     h.   $345 for LegalZoom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

     i.   $210 for liability insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     j.   $400 for cellular-telephone service . . . . . . . . . . . . . . . . . . . . . . . . . 34

     k.   $1,023 for Ms. Haskins' laptop computer . . . . . . . . . . . . . . . . . . . . . 35

     l.   $1,610 for travel expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

3.     Section 6662(a) penalty for 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>: On July 22, 2015, the respondent (hereafter the IRS) mailed a notice of deficiency to the married petitioners, Ms. Janice Kay Haskins and Mr. Julian William Haskins.[1] The notice reflected the following determinations:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|-----------|----------------------|
| 2011 | $4,184 | $836.80 |
| 2012 | 25,034 | 4,979.40 |

---

[1]Unless otherwise indicated, all references to sections are to the Internal Revenue Code of 1986, as amended and in effect for tax years 2011 and 2012. All references to Rules are to the Tax Court Rules of Practice and Procedure.

[*3] The Haskinses filed a timely petition for redetermination of the deficiencies and penalties, as they were permitted to do under section 6213(a). We have jurisdiction under section 6214(a).

After concessions by the parties, there are three issues to be decided.

1.  Is Ms. Haskins eligible for the foreign-earned-income exclusion under section 911(a) for 2011 and 2012? We hold she is not eligible. See infra part 1.

2.  Are the Haskinses entitled to deduct $7,440 that they reported on their 2012 return for unreimbursed employee business expenses? In their brief, the Haskinses address the issue by arguing that they are entitled to $6,109 of business-expense deductions for $6,109 of alleged payments. Of the $6,109 of alleged payments, we hold:

    - $609 is business-expense deductions for 2012,[2] comprising:

        ○ $54 for painting supplies (see infra part 2(e))

        ○ $345 for LegalZoom service (see infra part 2(h))

        ○ $210 for liability insurance (see infra part 2(i))

---

[2]None of the $609 of deductions are miscellaneous itemized deductions under sec. 67(b).

**[*4]** ● $1,558 of payments is capital expenses that give rise to depreciation deductions over multiple years. The first year of depreciation is 2012. Later years of depreciation are not at issue in this case. The amount of depreciation deduction for 2012 will be computed under Rule 155.[3] The $1,558 in payments giving rise to these depreciation deductions comprises:

  ○ $1,100 for a metal brake (see infra part 2(a))

  ○ $264 for a paint sprayer and parts (see infra part 2(b))

  ○ $194 for an air compressor and parts (see infra part 2(c))

● $3,942 is not deductible, comprising:

  ○ $489 for a power generator (see infra part 2(d))

  ○ $354 for circular saw blades (see infra part 2(f))

  ○ $66 for reciprocating saw blade sets (see infra part 2(g))

  ○ $400 for cellular-telephone service (see infra part 2(j))

  ○ $1,023 for a laptop computer (see infra part 2(k))

  ○ $1,610 for travel expenses (see infra part 2(l))

---

[3]None of the depreciation deductions for 2012 are miscellaneous itemized deductions under sec. 67(b).

[*5] 3.   <u>Are the Haskinses liable for a penalty for 2012 under section 6662(a)?</u>

Section 6662(a) and (b)(2), in relevant part, imposes a 20% penalty on the portion of an underpayment that is attributable to a substantial understatement of income tax.  We hold that the underpayment for 2012 is attributable to a substantial understatement of income tax if computations under Rule 155 show that there is a substantial understatement for 2012.  <u>See</u> <u>infra</u> part 3.  We also hold that for no portion of the underpayment for 2012 did the Haskinses have reasonable cause or act in good faith.  <u>See</u> <u>infra</u> part 3.

FINDINGS OF FACT

Mr. and Ms. Haskins resided in Florida when the petition was filed.[4]

In September 2011, Ms. Haskins retired from the U.S. Army.  Immediately before her retirement she had been stationed in Afghanistan working in Army intelligence.  The record does not reveal how long she had been stationed in Afghanistan or where she had been stationed before Afghanistan.  Before she worked in Army intelligence, Ms. Haskins had worked as an x-ray technician both in and out of the Army, but the record does not reveal where.

---

[4]Thus the venue for any appeal of the decision in this case will be the U.S. Court of Appeals for the Eleventh Circuit, unless the parties stipulate otherwise. <u>See</u> sec. 7482(b).

**[*6]**   When Ms. Haskins retired from the Army in September 2011, Mr. Haskins and the Haskinses' two children were living in the family home in Arizona.  After retiring, Ms. Haskins traveled from Afghanistan to Arizona where her family lived.

On September 26, 2011, Ms. Haskins began working for Science Applications International Corp. (SAIC).  Initially she had a short training assignment in the Washington, D.C., area.  During this training she attended a tax briefing by SAIC.  One of the subjects of the tax briefing was the section 911 foreign-earned-income exclusion.

On October 29, 2011, still an SAIC employee, Ms. Haskins began working in Afghanistan again.  While in Afghanistan, Ms. Haskins lived and worked on U.S. military bases.  She spent all of her time on the bases.  As she explained:  "I was not allowed off of the military base.  I was sequestered there.  I didn't go outside."  Her food and lodging in Afghanistan were supplied by the U.S. government.  She paid to have cellular-telephone service and internet service in Afghanistan.  She had an Army Post Office mailing address while in Afghanistan that she used to send and receive mail.  She kept her U.S. bank account while in Afghanistan.  Her SAIC paychecks were deposited into this account.  While in Afghanistan, she remained registered to vote in Arizona.  Ms. Haskins' family--her

**[*7]** husband and two children--did not have the option of moving to Afghanistan with her.

The U.S. Department of Defense issued Ms. Haskins a letter of authorization, which is a travel document that shows where the holder is permitted to travel and what government services the holder may access there. The letter authorized Ms. Haskins to work in Afghanistan and certain other countries in the Middle East from October 23, 2011, to December 31, 2012.

On April 20, 2012, Ms. Haskins took a 22-day vacation to visit her family in the United States. She and her family vacationed in Florida during that time.

On May 11, 2012, at the end of the vacation, she traveled from Florida back to Afghanistan.

On June 10, 2012, while in Afghanistan, Ms. Haskins wrote an email to SAIC employee Robin Ludi. The email said:

> I need clarification on couple of things. The main one could you find out when I can come back without getting in trouble with the IRS? I have heard so many different numbers and R&R counts or doesn't count toward those days. I am so miserable at this new FOB [forward operating base] ... my other FOB I loved. Husband and I talked about me extending for another year because I enjoyed it. I also found out in February my Mom has cancer * * *

**[*8]** On June 11, 2012, Ms. Ludi forwarded Ms. Haskins' email to Eric Studnicki, an SAIC program manager. On the same day, Mr. Studnicki emailed a response to Ms. Haskins:

> Hope your mother is ok.
>
> You are not eligible for tax free status until you hit the 330 day mark in country.
>
> Your year did not begin until the date you arrived in theater - I am tracking 29 OCT 11. You are not eligible for a completion bonus until 29 OCT 12.
>
> If you could be moved to another area would you reconsider extending?

The record does not contain Ms. Haskins' response to Mr. Studnicki's email.

Meanwhile in Arizona, Mr. Haskins was employed as a construction worker by L D Greer Builders & Trim where he had worked since before 2006. He worked for the company during the year 2011, but he went into business for himself in the first half of 2012. During 2011, he earned $17,292 in wages from L D Greer Builders & Trim, and during 2012, $9,081.

In August 2012, Mr. Haskins moved from Arizona to Florida. He was accompanied by the Haskinses' daughter and the Haskinses' household goods. The move was paid for by the Army. The Haskinses' son remained in Arizona.

**[*9]** Ms. Haskins was still in Afghanistan during this move. Mr. Haskins did not immediately find work in Florida.

In October 2012, while in Afghanistan, Ms. Haskins prepared the joint return for herself and her husband for the 2011 year. The return reported that Ms. Haskins earned $37,703 from the Army and $36,597 from SAIC and that she qualified for the foreign-earned-income exclusion. The line "List your tax home(s) during the tax year and date(s) established" was left blank. The return reported that Ms. Haskins was in a foreign country at least 330 days of a 12-month period that the return identified as October 1, 2011, to October 4, 2012.[5] It reported that her foreign earned income was $36,597, which was the amount she was paid by SAIC during the year, and that the exclusion was limited to $23,411 by section 911(b)(2)(A).

On November 6, 2012, Ms. Haskins left her job at SAIC. She traveled from Afghanistan to Arizona, where the Haskinses' son was, then to Florida to live in the family home. The record does not indicate when exactly she traveled from

---

[5]The period identified on the return is slightly over 12 months.

**[\*10]** Arizona to Florida. Nor does the record contain any other information about the trip.[6]

Sometime in early 2013, Mr. Haskins found work in Florida. He started doing construction work of the type he had done in Arizona.

In 2013, while in Florida, Ms. Haskins prepared the joint return for herself and her husband for the 2012 year. The return reported that Ms. Haskins earned $171,527 from SAIC and that she qualified for the foreign-earned-income exclusion. The line "List your tax home(s) during the tax year and date(s) established" was left blank. The return reported that Ms. Haskins was present in a foreign country at least 330 days of a 12-month period that the return identified as October 28, 2011, to November 10, 2012.[7] The return reported that her foreign earned income was $171,527, which was the amount she was paid by SAIC during the year and that the exclusion was limited to $90,916 by section 911(b)(2)(A). The return reported that the Haskinses were entitled to deduct $7,440 for

---

[6]In the Haskinses' brief they explained that Ms. Haskins and the Haskinses' son traveled from Arizona to Florida in November 2012 and that they brought with them several family vehicles, including a recreational vehicle. The IRS does not contest this.

[7]The period identified on the return is slightly more than 12 months.

[*11] unreimbursed employee business expenses, which consisted of the following amounts:

| | |
|---|---:|
| Union dues | $12 |
| Uniforms for work | 1,260 |
| Small tools for work | 1,750 |
| Job supplies | 2,808 |
| Travel expenses while away from home overnight, excluding meals and entertainment | 1,460 |
| Meals and entertainment (50% of $300 under sec. 274(n)(1)). | 150 |
| Total | 7,440 |

The $7,440 in deductions for unreimbursed employee business expenses was the only type of miscellaneous itemized deductions reported on the 2012 return. By law, miscellaneous itemized deductions are allowed only to the extent the total miscellaneous itemized deductions for the year exceed 2% of adjusted gross income. Sec. 67(a). The Haskinses reported that their adjusted gross income was $92,033. They reported that the amount of their miscellaneous itemized deductions, after application of the 2% floor, was

$7,440 – (2%)($92,033)

= $7,440 – $1,840.66

= $5,599 (rounded to the nearest dollar).

On July 22, 2015, the IRS mailed the Haskinses a notice of deficiency for 2011 and 2012 making various adjustments to the income and deductions reported

[*12] on the Haskinses' returns for 2011 and 2012. The notice of deficiency also determined that the Haskinses were liable for section 6662(a) accuracy-related penalties for negligence or disregard of rules or regulations or substantial understatements of income tax for 2011 and 2012. Concessions by the parties have narrowed the issues for decision. We describe the concessions for each year below.

2011. For 2011, the Haskinses conceded adjustments related to $2 of unreported dividend income and $27 of unreported interest income. The IRS conceded a $6,609 adjustment for canceled-debt income. The IRS also conceded the section 6662(a) penalty. These concessions for 2011 leave only one issue for decision for 2011, which is Ms. Haskins' entitlement to the foreign-earned-income exclusion.

2012. For 2012, the Haskinses conceded adjustments related to $72 of unreported dividend income; $95 of unreported interest income; $1,844 of deductions for taxes on Schedule F (a schedule entitled, "Profit or Loss From Farming"); $9,541 of deductions for mortgage interest claimed on Schedule F; $6,999 of wage income; $1,558 of home-mortgage interest deduction; and $461 of deductions for other taxes. The parties agreed that the Haskinses are entitled to a $137 credit for income-tax withholding. This amount had been allowed by the

[*13] notice of deficiency as a pro-taxpayer adjustment. The IRS conceded the negligence component of the section 6662(a) penalty. These concessions for 2012 leave the following three issues for decision for 2012: (1) Ms. Haskins' entitlement to the foreign-earned-income exclusion; (2) the deduction of $7,440 for unreimbursed employee business expenses; and (3) the Haskinses' liability for the substantial understatement component of the section 6662(a) penalty.

## OPINION

As a general rule, the taxpayer has the burden of proving that the IRS's determinations in the notice of deficiency are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, section 7491(a) imposes the burden of proof on the IRS as to any factual issue relevant to a taxpayer's liability for tax if certain conditions are met. The Haskinses do not contend that these conditions are met, nor does the record show that these conditions are met. Therefore, the Haskinses have the burden of proof regarding all factual issues related to the amount of the deficiency. We discuss the burden of proof regarding the Haskinses' liability for the penalty separately. See infra part 3.

1.    Foreign-earned-income exclusions for 2011 and 2012

Section 911(a) provides that a qualified individual may elect to exclude foreign earned income, as defined in section 911(b)(1)(A), from gross income for

[*14] any taxable year. The amount of foreign earned income excluded under section 911(a) is limited to the amount calculated under section 911(b)(2)(A).

Section 911(d)(1) defines a qualified individual as

an individual whose tax home is in a foreign country and who is--

> (A) a citizen of the United States and establishes to the satisfaction of the Secretary [of Treasury] that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or

> (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period.

Section 911(d)(1) requires the individual to have a tax home in a foreign country. The Code does not expressly set forth the period during which the existence of a foreign tax home is tested. Section 1.911-2(a)(1), Income Tax Regs., provides that for a person to have a tax home in a foreign country, the person's tax home must be in a foreign country "throughout" either of the two following periods:

- the period described in section 911(d)(1)(A), or

- the 330 days described in section 911(d)(1)(B).

The definition of a tax home is found in section 911(d)(3), which provides: "The term "tax home" means, with respect to any individual, such individual's home for purposes of section 162(a)(2) (relating to traveling expenses while away

**[\*15]** from home). An individual shall not be treated as having a tax home in a foreign country for any period for which his abode is within the United States." Section 162(a)(2) allows a deduction for ordinary and necessary expenses paid during the taxable year in carrying on a trade or business, including travel expenses incurred while away from home in the pursuit of a trade or business. For purposes of section 162(a)(2), a taxpayer's home is generally "the vicinity of the taxpayer's principal place of employment and not where his or her personal residence is located." Mitchell v. Commissioner, 74 T.C. 578, 581 (1980).

Under the second sentence of section 911(d)(3), a person is not treated as having a tax home in a foreign country while the person's abode is in the United States. Section 1.911-2(b), Income Tax Regs., provides guidance for determining whether an individual's abode is in the United States:

> Temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States during that time. Maintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean that the individual's abode is in the United States.

In section 911 cases, we have compared a person's domestic ties (i.e., his or her familial, economic, and personal ties to the United States) with his or her ties to the foreign country in which he or she claims a tax home in order to determine

**[*16]** whether his or her abode was in the United States during a particular period. See, e.g., Harrington v. Commissioner, 93 T.C. 297, 307-308 (1989). Even though a person may have some limited ties to a foreign country during a particular period, if the person's ties to the United States remain strong, we have held that his or her abode remained in the United States, especially when his or her ties to the foreign country were transitory or limited during that period. Id. at 308.

Foreign earned income is defined by section 911(b)(1)(A) as income that is (1) earned income, (2) received by the individual from foreign sources, and (3) attributable to services performed by the individual during the period described in section 911(d)(1)(A) or (B), whichever is applicable. Earned income is defined as amounts paid for compensation for personal services actually rendered. Sec. 911(d)(2)(A). Earned income is considered to have been received from foreign sources if the income is attributable to services performed by an individual in a foreign country. Sec. 1.911-3(a), Income Tax Regs.

To be a qualified individual, Ms. Haskins must meet the tax-home test of section 911(d)(1) and either the residency test in section 911(d)(1)(A) or the 330-day test in section 911(d)(1)(B). The Haskinses concede that Ms. Haskins was not a resident of Afghanistan and therefore does not meet the residency test in section 911(d)(1)(A). The IRS concedes that Ms. Haskins meets the 330-day test in

[*17] section 911(d)(1)(B). Therefore, Ms. Haskins is a qualified individual if her tax home was in Afghanistan. Ms. Haskins' tax home was in Afghanistan if (1) her principal place of employment was in Afghanistan and (2) her abode was not in the United States. See secs. 911(d)(3), 162(a)(2); Mitchell v. Commissioner, 74 T.C. at 581. It is uncontested that Ms. Haskins' principal place of employment during the relevant periods was in Afghanistan. Therefore, her tax home was in Afghanistan unless her abode was in the United States. See sec. 911(d)(3).

Ms. Haskins had strong ties to the United States during the relevant period.[8] Her husband and two children lived in the family home, which was in Arizona until August 2012 and in Florida after that. (The son lived in Arizona by himself

---

[8]The location of an individual's tax home (and abode) is evaluated for each day of the 330 days described in sec. 911(d)(1)(B). Sec. 1.911-2(a)(1)(ii), Income Tax Regs. Although the parties have agreed that Ms. Haskins was physically present during the requisite sets of 330 days for each of the tax years 2011 and 2012, they have not taken a position regarding which particular days make up each set of 330 days. (There are two sets of 330 days. One set is for the purpose of determining eligibility for the foreign-earned-income exclusion for 2011. The other set is for 2012.) The Haskinses reported on their tax returns that the two sets of 330 days were within the period October 1, 2011, to November 10, 2012. The IRS has not disputed that the two sets of 330 days are within the period October 1, 2011, to November 10, 2012. We hold that Ms. Haskins' abode was in the United States every day of the period October 1, 2011, to November 10, 2012. It is unnecessary to determine which days within this period make up the two sets of 330 days.

**[\*18]** from August to November 2012, however.)  Though Ms. Haskins had lived in Afghanistan during a portion of her time with the Army and then from October 2011 through November 2012 while working for SAIC, she did not have strong nonwork ties to Afghanistan.  When she was with SAIC in Afghanistan, she worked and lived on forward operating bases.  These bases were often under attack by rocket-propelled grenades and suicide bombers.  She could not leave the bases.  See Daly v. Commissioner, T.C. Memo. 2013-147, at \*3-\*4, \*11-\*13 (holding that where taxpayer worked for a defense contractor in Afghanistan and Iraq from August 29 to December 12, 2007, and from January 25 to April 28, 2008; he lived and worked on U.S. military bases and could not go off base; and his family and family home were in the United States, abode was in the United States); cf. Eram v. Commissioner, T.C. Memo. 2014-60, at \*2-\*9, \*18-\*20 (holding that where taxpayer was born in Iraq and lived there until age 19, then moved to the United States; from early 2008 to July 2009 worked as an interpreter for a defense contractor in Iraq; lived and worked exclusively in the Green Zone when not on missions; had family in both the United States and Iraq; and had no family home in the United States, abode was not in the United States).  When her mother was diagnosed with cancer, Ms. Haskins returned to the United States.

[*19] We conclude that Ms. Haskins' abode was in the United States during the relevant period. See supra note 8. It follows that she did not have a foreign tax home and that she was not a qualified individual. None of her income is excludable under section 911(a) for tax years 2011 and 2012.

2.      Deductions for business expenses for 2012

On their 2012 return, the Haskinses claimed $7,440 of deductions for unreimbursed employee business expenses. In their brief they conceded that the deductions they seek consist of business expenses totaling $6,109. We will discuss the types of deductions set forth in the Internal Revenue Code that are potentially applicable to the $6,109 list.

The income tax is a function of taxable income. Sec. 1(a)(1). Taxable income is equal to gross income minus certain deductions. Sec. 63(a). Personal, living, or family expenses are not deductible as a general rule. Sec. 262(a). Section 162(a) allows a deduction for the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The performance of services as an employee is considered a trade or business. Primuth v. Commissioner, 54 T.C. 374, 377-378 (1970).

A payment to buy an asset that has a useful life exceeding one year is a capital expenditure and cannot be immediately deducted. See sec. 263(a); Ellis

[*20] <u>Banking Corp. v. Commissioner</u>, 688 F.2d 1376, 1379 (11th Cir. 1982),

<u>aff'g in part, remanding in part</u> T.C. Memo. 1981-123.  However, section 167(a)

allows a depreciation deduction for a reasonable allowance for exhaustion, wear

and tear, and obsolescence of property if the taxpayer uses such property in a trade

or business (including the trade or business of being an employee, <u>see</u> <u>Rutledge v.</u>

<u>Commissioner</u>, T.C. Memo. 1993-613, 66 T.C.M. (CCH) 1696, 1697 (1993)).  For

tangible property, the amount of the deduction under section 167(a) is determined

using the rules of section 168.  <u>See</u> sec. 167(b).  These rules set forth the

applicable depreciation method, the applicable recovery period, and the applicable

convention.  Sec. 168(a).  To be entitled to a depreciation deduction, the taxpayer

must establish the property's depreciable basis by showing its cost.  <u>See</u> sec.

167(c); <u>Cluck v. Commissioner</u>, 105 T.C. 324, 337 (1995).  The applicable

recovery period depends on the particular class of tangible property.  Sec. 168(c).

Section 179 permits a taxpayer to elect to treat the cost of certain types of

tangible property not as a capital expense but as a deduction for the year in which

the property is first placed in service, up to specified dollar limits.  <u>See</u> secs.

179(a) and (b), 263(a)(1)(G).  An election to treat the cost of property as

deductible under section 179 must be made on the tax return.  Sec. 179(c)(1).

[*21] Section 217(a) allows a deduction for "moving expenses paid or incurred during the taxable year in connection with the commencement of work by the taxpayer as an employee or as a self-employed individual at a new principal place of work." Moving expenses are defined as "the reasonable expenses--(A) of moving household goods and personal effects from the former residence to the new residence, and (B) of traveling (including lodging) from the former residence to the new place of residence." Sec. 217(b)(1). The moving expenses of a member of the taxpayer's household are also deductible under section 217(a). Sec. 217(b)(2). The expenses of meals are not deductible under section 217(a). Sec. 217(b)(1). No deduction is allowed under section 217(a) unless (A) the taxpayer is a full-time employee at the new principal place of work during the 12-month period following the taxpayer's arrival in the general location of the new principal place of work for at least 39 weeks or (B) during the 24-month period following the taxpayer's arrival in the general location of the new principal place of work, the taxpayer is a full-time employee (or performs services as a self-employed individual on a full-time basis) in such general location during at least 78 weeks, of which not fewer than 39 weeks are during the 12-month period immediately following arrival in the general location of the new principal place of work. Sec. 217(c)(2).

**[\*22]** Section 67(a) provides that miscellaneous itemized deductions are allowed only to the extent that the total amount of such deductions exceeds 2% of adjusted gross income. A deduction under section 162(a), 167(a), or 179 is a miscellaneous itemized deduction if it is related to the business of performing services as an employee. Secs. 67(b), 63(d), 62(a). (A deduction related to the business of performing services as an employee is referred to as an unreimbursed employee business expense.) A deduction under section 162(a), 167(a), or 179 is not a miscellaneous itemized deduction if it is related to a business other than performing services as an employee. Secs. 67(b), 63(d), 62(a)(1). A section 217(a) moving-expense deduction is not a miscellaneous itemized deduction. Secs. 67(b), 63(d), 62(a)(15).

If a taxpayer establishes that a deductible expense has been paid but is unable to substantiate the precise amount, we may estimate the amount of the deductible expense, bearing heavily against the taxpayer. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930). This principle is known as the Cohan rule. We cannot estimate deductible expenses, however, unless the taxpayer presents evidence sufficient to provide some reasonable basis upon which estimates may be made. See Williams v. United States, 245 F.2d 559, 560-561 (5th Cir. 1957); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

**[*23]** Furthermore, section 274(d) provides that no deduction is allowable under section 162 for any traveling expenses, including meals and lodging while away from home, or with respect to listed property, defined in section 280F(d)(4) to include computers but not cellular telephones,[9] unless the taxpayer complies with strict substantiation rules. See sec. 274(d)(1), (4). To wit, the taxpayer must substantiate the amount, time, place, and business purpose of these expenses "by adequate records or by sufficient evidence corroborating the taxpayer's own statement". Sec. 274(d); see sec. 1.274-5T(b) and (c), Temporary Income Tax Regs., 50 Fed. Reg. 46014, 46016 (Nov. 6, 1985). These strict substantiation rules of section 274(d) supersede the Cohan rule. See Sanford v. Commissioner, 50 T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

    a.    $1,100 for a metal brake

On June 29, 2012, Ms. Haskins paid $1,100 for a metal brake for her husband to use in his business. A metal brake is a tool that bends sheet metal. It

---

[9]For taxable years beginning after December 31, 2009, cellular telephones are no longer included in the definition of listed property under sec. 280F(d)(4), which was amended by the Small Business Jobs Act of 2010, Pub. L. No. 111-240, sec. 2043(a), 124 Stat. at 2560. As a result of this amendment, an expense for cellular telephone use for taxable year 2012 is not subject to the strict substantiation rules of sec. 274(d). Computers are listed property for the years at issue. Secs. 280F(d)(4)(iv), 168(i)(2)(B).

[*24] is used for roof construction. The payment of the $1,100 is substantiated by Ms. Haskins' written check to the seller and by an email from the seller confirming the price. The IRS contends that a deduction is not allowable with respect to the metal brake (and with respect to all tools and supplies purchased for Mr. Haskins) because Mr. Haskins was not an employee at the time of the purchase.

The Haskinses cannot immediately deduct the metal brake under section 162(a) because it has a useful life of more than one year.

The Haskinses did not make a section 179 election.

We next consider whether there is a depreciation deduction for the metal brake under section 167(a) for property used in a trade or business. The record (including the testimony of Mr. Haskins) establishes that the metal brake was purchased for Mr. Haskins' own business of construction, not for his business of performing services as an employee of L D Greer Builders & Trim.[10] The fact that the metal brake was not purchased for the business of performing services as an

---

[10]The Haskinses reported various payments as unreimbursed employee business expenses on their 2012 return. These payments reported on the tax return include some or all of the $6,109 of payments the Haskinses alleged at trial are deductible. Thus, the tax return suggests that some or all of the $6,109 of payments are expenses of an employee, not a self-employed individual. Ms. Haskins acknowledged in her testimony that she was mistaken in reporting all of the payments as unreimbursed employee business expenses.

**[\*25]** employee does not preclude a deduction under section 167(a).  Mr. Haskins placed the metal brake in service in 2012.  Therefore, the Haskinses are entitled to a depreciation deduction under section 167(a) with respect to the metal brake for 2012.

With some exceptions, section 168(k) allows an additional 50% depreciation deduction for the year in which property is placed in service if the property (1) has a recovery period of 20 years or less; (2) was first used by the taxpayer after December 31, 2007; (3) was acquired by the taxpayer after December 31, 2007, and before January 1, 2013; and (4) was placed in service by the taxpayer before January 1, 2014.  On the basis of the record, we conclude that the metal brake is eligible for the additional 50% depreciation deduction for 2012.

We also need to consider (1) the classification of the property, (2) the basis for depreciation, (3) the recovery period, (4) the convention, and (5) the method. See secs. 167 and 168.  On the basis of the record, we conclude that (1) the metal brake is seven-year property, see sec. 168(e)(3)(C)(v)(I); (2) the basis for depreciation is $1,100, see secs. 167(c)(1), 1011, 1012, 1016; (3) the recovery period is seven years, see sec. 168(c); (4) the half-year convention is applicable, see sec. 168(d)(1); and (5) the applicable depreciation method is the 200%-declining-balance method, see sec. 168(b)(1)(A).

[*26] Furthermore, the record shows that the expense was not an employee business expense or any other miscellaneous itemized deduction subject to the 2% floor of section 67(a).

### b. $264 for a paint sprayer and parts

The Haskinses contend that Mr. Haskins bought a paint sprayer and parts. The record shows that the Haskinses paid in 2012 the following amounts:

- $234 for a paint sprayer;

- $8 for a roller hop for the paint sprayer; and

- $22 for a bladder to hold paint for the paint sprayer and an extension cord for the paint sprayer.

We refer to the paint sprayer and parts, hereafter, as the paint sprayer.

A section 162(a) deduction is not allowable for the paint sprayer because it has a useful life of more than one year and because the Haskinses did not make a section 179 election.

The fact that the paint sprayer was purchased for Mr. Haskins' own business, rather than his activities as an employee, does not preclude a depreciation deduction under section 167(a). Mr. Haskins placed the paint sprayer in service in 2012. Therefore, the Haskinses are entitled to a depreciation deduction with respect to the paint sprayer for 2012.

**[*27]** With some exceptions, section 168(k) allows an additional 50% depreciation deduction for the year in which property is placed in service if the property (1) has a recovery period of 20 years or less; (2) was first used by the taxpayer after December 31, 2007; (3) was acquired by the taxpayer after December 31, 2007, and before January 1, 2013; and (4) was placed in service by the taxpayer before January 1, 2014.  On the basis of the record, we conclude that the paint sprayer is eligible for the additional 50% depreciation deduction for 2012.

We also need to consider (1) the classification of the property, (2) the basis for depreciation, (3) the recovery period, (4) the convention, and (5) the method.  See secs. 167 and 168.  On the basis of the record, we conclude that (1) the paint sprayer is seven-year property, see sec. 168(e)(3)(C)(v)(I); (2) the basis for depreciation is $264, see secs. 167(c)(1), 1011, 1012, 1016; (3) the recovery period is seven years, see sec. 168(c); (4) the half-year convention is applicable, see sec. 168(d)(1); and (5) the applicable depreciation method is the 200%-declining-balance method, see sec. 168(b)(1)(A).

Furthermore, the record shows that the cost of the paint sprayer was not an employee business expense or any other miscellaneous itemized deduction subject to the 2% floor of section 67(a).

**[*28]** c.     $194 for an air compressor and attachments

The Haskinses contend that Mr. Haskins bought an air compressor and attachments for his work.  On June 29, 2012, Mr. Haskins bought an air compressor from Lowe's for $179.  He later bought $15 of attachments for the compressor.  We refer to the air compressor and the attachments, hereafter, as the air compressor.

A section 162(a) deduction is not allowable for the air compressor because it has a useful life of more than one year.

The Haskinses did not make a section 179 election.

We now consider whether the purchase of the air compressor gives rise to a depreciation deduction under section 167(a).  The fact that the air compressor was purchased for Mr. Haskins' own business, rather than his activities as an employee, does not preclude a depreciation deduction under section 167(a).  Mr. Haskins placed the air compressor in service in 2012.  Therefore, the Haskinses are entitled to a depreciation deduction with respect to the air compressor for 2012.

With some exceptions, section 168(k) allows an additional 50% depreciation deduction for the year in which property is placed in service if the property (1) has a recovery period of 20 years or less; (2) was first used by the

**[*29]** taxpayer after December 31, 2007; (3) was acquired by the taxpayer after December 31, 2007, and before January 1, 2013; and (4) was placed in service by the taxpayer before January 1, 2014.  On the basis of the record, we conclude that the air compressor is eligible for the additional 50% depreciation deduction for 2012.

We also need to consider (1) the classification of the property, (2) the basis for depreciation, (3) the recovery period, (4) the convention, and (5) the method. See secs. 167 and 168.  On the basis of the record, we conclude that (1) the air compressor is seven-year property, see sec. 168(e)(3)(C)(v)(I); (2) the basis for depreciation is $194, see secs. 167(c)(1), 1011, 1012, 1016; (3) the recovery period is seven years, see sec. 168(c); (4) the half-year convention is applicable, see sec. 168(d)(1); and (5) the applicable depreciation method is the 200%-declining-balance method, see sec. 168(b)(1)(A).

Furthermore, the record shows that the air compressor was not an employee business expense or any other miscellaneous itemized deduction subject to the 2% floor of section 67(a).

### d. $489 for a power generator

Mr. Haskins credibly testified that he purchased a power generator in 2012 for his construction work when he moved from Arizona to Florida.  However, he

[*30] did not testify how much he paid for the generator. Nor does any documentary evidence show how much he paid. Although the Haskinses' brief states that the price of the power generator was $489, this assertion is not supported by any evidence. There is no reasonable basis in the record for determining the cost of the generator. Therefore, the Haskinses have not proven their entitlement to any type of deduction related to the cost of the generator, including a depreciation deduction. See Cluck v. Commissioner, 105 T.C. at 337. They are not entitled to a deduction related to the generator.

e. $54 for painting supplies

The record shows that Mr. Haskins made the following purchases of painting supplies in 2012:

- $11 for a paint brush;

- $5 for a bamboo pole for holding paint brushes;

- $3 for masking tape;

- $7 for an eight-in-one painter's tool;

- $19 for a wooster two-inch brush;

- $5 for a drop cloth; and

- $4 for silicone.

[*31] The IRS contends that no business-expense deduction should be allowed for these supplies because Mr. Haskins did not buy the supplies for his work as an employee of L D Greer Builders & Trim. But deductible business expenses include both the expenses of working as an employee and the expenses of one's own business. The record demonstrates that the supplies were purchased for Mr. Haskins' own business. Furthermore, the cost of the supplies is not a capital expense because, on this record, we determine that the useful life of the supplies is less than one year. The Haskinses are therefore entitled to a $54 deduction for painting supplies for the 2012 year. And the expense is not an employee business expense deduction or any other miscellaneous itemized deduction subject to the 2% floor.

f.  $354 for circular saw blades

The Haskinses contend that Mr. Haskins bought "circular saw blades" costing $59 per pack and that he bought a pack every 2 months on average. Thus, they contend he paid a total of $354 for 2012, equal to $59 × 6. Although Ms. Haskins testified vaguely that her husband bought "saw blades" from Lowe's and Home Depot, the record does not indicate how many circular saw blades he bought or how much he paid for them. The Haskinses have not provided any evidentiary basis for applying the Cohan rule to the expenses of Mr. Haskins'

[*32] circular saw blades for 2012.  See Vanicek v. Commissioner, 85 T.C. at 742-743 (citing Williams, 245 F.2d 559).  They are not entitled to a deduction for circular saw blades.

g.      $66 for reciprocating saw blade sets

The Haskinses contend on brief that Mr. Haskins bought "reciprocating saw blade sets" costing $22 per pack and that he bought a set three times a year.  This would be a total expense of $66, equal to $22 × 3.  Although Ms. Haskins testified vaguely that her husband bought "saw blades" from Lowe's and Home Depot, the record does not indicate how many reciprocating saw blade sets he bought or how much he paid for them.  The Haskinses have not provided any evidentiary basis for applying the Cohan rule to the expenses of Mr. Haskins' reciprocating saw blade sets for 2012.  See Vanicek v. Commissioner, 85 T.C. at 742-743 (citing Williams, 245 F.2d 559).  They are not entitled to a deduction for reciprocating saw blade sets.

h.      $345 for LegalZoom

Ms. Haskins testified that she paid $345 in 2012 to LegalZoom (an online legal service) to acquire a workers' compensation exemption certificate to allow Mr. Haskins to work in Florida.  Exhibit 27, page 4, shows that on October 9, 2012, Ms. Haskins paid LegalZoom $345.95.  The Haskinses argue that there

**[\*33]** should be a $345 deduction for the payment. The IRS contends that the fact of payment is unsupported by the record. However, as we explained above, the fact of payment is supported by Ms. Haskins' testimony and by documentary evidence. We conclude that the $345 payment is a deductible business expense under section 162(a) for 2012. And the expense is not an employee business expense or any other miscellaneous itemized deduction subject to the 2% floor of section 67(a).

### i. $210 for liability insurance

The Haskinses contend that they paid $210 for liability insurance, equal to $70 per month for three months, and that such insurance was necessary for Mr. Haskins to work in Florida. The IRS contends that the $210 deduction should be disallowed for three reasons. First, the IRS observes that the only document in the record relating to the liability-insurance expense is a monthly invoice from the insurance company for $70. The IRS contends that the invoice proves only that the expense was invoiced, not that the expense was paid. Second, the IRS argues that by the date of the invoice--November 15, 2012--Mr. Haskins had stopped working as an employee for L D Greer Builders & Trim. Third, the IRS argues that the Haskinses had not claimed the $210 deduction on their return.

[*34] We hold that the $210 expense is deductible under section 162(a) for 2012. An invoice normally shows only that a payment was demanded, not that a payment was made. But this invoice has a handwritten notation that $70 was paid every month for three months in 2012. From this handwritten annotation and from Ms. Haskins' testimony that the Haskinses paid liability-insurance premiums, we find that the Haskinses paid $210 for liability insurance for 2012.

The fact that the payments were made for the period after Mr. Haskins was an employee does not preclude a deduction. A taxpayer may deduct the expenses of the taxpayer's own business conducted not as someone else's employee. See sec. 162(a). Mr. Haskins credibly testified that to conduct his construction business in Florida he had to have liability insurance.

A taxpayer's failure to claim a deduction on a return does not preclude a deduction.

The $210 expense is deductible under section 162(a). Also, the expense is not an employee business expense or another miscellaneous itemized deduction subject to the 2% floor of section 67(a).

j.      $400 for cellular-telephone service

Ms. Haskins credibly testified that Mr. Haskins had a cellular telephone that he used for work. The Haskinses contend that they paid $400 for service for Mr.

**[\*35]** Haskins' cellular telephone, corresponding to 8 months at the rate of $50 per month. The IRS disputes that there is evidence showing that the Haskinses paid $400 for service to Mr. Haskins' cellular telephone.

We need not determine whether the record shows that the Haskinses paid $400 for service to Mr. Haskins' cellular telephone. Even if the record showed these payments were made, the Court does not have a reasonable basis for determining how much he used his cellular telephone for business purposes as opposed to personal purposes. It is a fact of life that people often use their cellular telephones for personal purposes. Mr. Haskins did not testify that he used his cellular telephone for only business purposes--or, alternatively, how much he used the cellular telephone for business purposes versus personal purposes. The Haskinses have not provided any evidentiary basis for applying the Cohan rule to the expense of Mr. Haskins' cellular-telephone service for 2012. See Vanicek v. Commissioner, 85 T.C. at 742-743 (citing Williams, 245 F.2d 559). The Haskinses are not entitled to a deduction for this expense.

k.　$1,023 for Ms. Haskins' laptop computer

On January 12, 2012, the Haskinses' son bought Ms. Haskins a laptop computer for $1,023 and shipped it to her in Afghanistan. Ms. Haskins credibly testified that she used the computer for submitting timesheets to her employer.

[*36] This was a business use. However, the record shows that she also used the laptop for the following personal uses: social media, shopping for personal items, and paying household bills. She testified that she estimated that she used the laptop 60% for business use and 40% for personal use.

A taxpayer must satisfy the strict substantiation requirements of section 274(d) in order to deduct expenses attributable to listed property, including computers. Sec. 280F(d)(4)(A)(iv). Regulations specify that, with respect to listed property, the taxpayer must substantiate the following elements: (1) the amount of the expenditure for each individual item of listed property; (2) the amount of each business use and total annual use of the property; (3) the date of the expenditure or use with respect to listed property; and (4) the business purpose of the expenditure or use. Sec. 1.274-5T(b)(1), (6), Temporary Income Tax Regs., 50 Fed. Reg. 46014, 46016 (Nov. 6, 1985). Each element can be substantiated by either (1) adequate records or (2) sufficient evidence corroborating the taxpayer's own statement. See sec. 274(d). Listed property includes computers. Secs. 280F(d)(4)(A)(iv), 168(i)(2)(B).

The only evidence of the business use of the laptop computer was Ms. Haskins' testimony. This testimony is her "own statement". Therefore, the Haskinses have not satisfied the strict substantiation requirements of section

**[\*37]** 274(d) with respect to the laptop computer.  They are not entitled to deduct the expense of the laptop computer.

l.      $1,610 for Ms. Haskins' travel expenses

The Haskinses argue that Ms. Haskins paid $1,460 in lodging and $300 for food for the trip she took from Arizona to Florida in late 2012.  As noted earlier, the Haskinses claimed a deduction for $1,460 in lodging expenses and for half of the $300 food expense (i.e., $150).  The IRS contends that because the Haskinses did not adduce any documentary evidence supporting the trip expenses, the strict substantiation requirements are not met.

The Haskinses originally reported that this expense was an unreimbursed employee business expense.  However, they have failed to prove that the trip is the expense of the business of performing services as an employee.  Nor have they proven that the trip is the expense of a business of a self-employed individual.  They have provided no documentary evidence regarding the trip or the expenses

[*38] related to it.[11] Thus, the Haskinses have failed to meet the strict substantiation requirements with respect to the expense.

Section 217(a) allows a taxpayer to deduct moving expenses. The deduction is available for the moving expenses of members of the taxpayer's household. Sec. 217(b)(2). No deduction is allowed under section 217(a) unless the taxpayer engages in full-time work for 39 weeks of the 12-month period following the taxpayer's arrival at the new location. Sec. 217(c)(2). Mr. Haskins arrived in Florida in August 2012. Therefore the 12-month period after his arrival in Florida started in August 2012 and ended in August 2013. Mr. Haskins was not working when he arrived in Florida in August 2012. This period of unemployment extended into 2013. Because of the length of this period of unemployment, which included over 17 weeks from September 1 to December 31, 2012, Mr. Haskins did not work more than 39 weeks of the 12-month period from August 2012 to August 2013. Consequently, he does not satisfy the 39-week test for deducting moving expenses. Similarly, Ms. Haskins' move to Florida does not

---

[11]Attached to the Haskinses' reply brief is a copy of a U-Haul equipment contract showing that Ms. Haskins rented a trailer hitch on November 8, 2012, and returned the trailer hitch on November 14, 2012. However, an attachment to a brief does not constitute admissible evidence and may not be considered by the Court. Kwong v. Commissioner, 65 T.C. 959, 967 n.11 (1976); Perkins v. Commissioner, 40 T.C. 330, 340 (1963).

**[*39]** justify a deduction for moving expenses for her as the taxpayer.  This is because there is no evidence Ms. Haskins had full-time work in Florida.  Thus, section 217(a) does not allow a deduction for the expenses of the trip.

We hold that there is no deduction for the expenses of the trip.

3.      Section 6662(a) penalty for 2012

We next determine whether the Haskinses are liable for the penalty under section 6662(a) for 2012.  Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax attributable to any of the causes listed in section 6662(b).  These causes include (1) a substantial understatement of income tax and (2) negligence or disregard of rules or regulations.  Sec. 6662(a) and (b)(1) and (2).

An understatement of income tax is the excess of (1) the correct tax over (2) the tax reported minus any rebate (within the meaning of section 6211(b)(2)).  Sec. 6662(d)(2)(A).  An understatement of income tax is substantial if two conditions are met:  (1) the understatement exceeds 10% of the correct tax and (2) the understatement exceeds $5,000.  Sec. 6662(d)(1)(A).

An underpayment is the amount by which the correct tax exceeds the excess of (1) the sum of (a) the tax reported plus (b) amounts not so reported that were previously assessed (or collected without assessment) over (2) any rebates made

**[*40]** (where a rebate is defined as so much of an abatement, credit, refund or other repayment, as was made on the ground that the correct tax was less than the excess of amount (1) over rebates previously made). Sec. 6664(a).

Section 6664(c)(1) provides that the penalty under section 6662(a) does not apply to any portion of the underpayment to the extent that the taxpayer had reasonable cause for that portion of the underpayment and acted in good faith with respect to that portion. Section 1.6664-4(b)(1), Income Tax Regs., provides:

> Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. * * * Reliance on * * * the advice of a professional tax advisor * * * does not necessarily demonstrate reasonable cause and good faith. * * * Reliance on * * * professional advice * * * constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. * * *

To establish reasonable cause and good faith through reliance on professional advice, the taxpayer must show that three tests are satisfied: "(1) [t]he adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d

**[*41]** Cir. 2002). To satisfy the third test, the taxpayer must show that the tax professional "opine[d] on the legitimacy" of the aspects of the return that were later challenged by the IRS. Id. at 100.

The IRS bears the initial burden of production regarding the applicability of the section 6662(a) penalty. Sec. 7491(c). Once the IRS meets its burden of production, the taxpayer must come forward with persuasive evidence that the section 6662(a) penalty is inapplicable, for example because a portion of the underpayment is due to reasonable cause and the taxpayer acted in good faith with respect to the portion. Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

Section 6751(b) provides that the initial determination to impose certain penalties, including the section 6662(a) penalty, must be personally approved in writing by the immediate supervisor of the person making the determination. See Graev v. Commissioner, 149 T.C. 485, 493 (2017) (holding that the IRS's burden of production under section 7491(c) includes establishing compliance with section 6751(b)), supplementing and overruling in part 147 T.C. 460 (2016).

The Haskinses conceded at trial that the supervisory-approval requirement of section 6751(b) has been met. Should the Rule 155 computations show a substantial understatement of income tax for 2012, the IRS will have met its burden of production for the section 6662(a) penalty.

[*42] The remaining issue for us to decide is whether there is any portion of the underpayment for 2012 that is due to reasonable cause and for which the Haskinses acted in good faith.

The Haskinses contend that there are four reasons showing that they had reasonable cause for, and acted in good faith with respect to, claiming the foreign-earned-income exclusion for 2012.

First, they contend that, at the SAIC tax briefing in the fall of 2011, Ms. Haskins was told that she needed to satisfy only the 330-day test to qualify for the foreign-earned-income exclusion. About this briefing, she testified that "the company SAIC had told me if you meet the 330 days in country, then you qualify." The proposition that the 330-day test is the only requirement for claiming the foreign-earned-income exclusion is contrary to the text of section 911. Section 911(d)(1) requires an individual to both have a tax home in a foreign country and satisfy the 330-day test (or alternatively the residency test). More generally, the Haskinses have not proven that her participation in the SAIC tax briefing justifies the conclusion that she made a reasonable attempt to comply with the provisions of section 911. The record leaves unanswered several important questions about the SAIC tax briefing. Were the persons who gave the tax

**[*43]** briefing knowledgeable enough to give tax advice to Ms. Haskins? Did they know facts specific to Ms. Haskins? What exactly did they tell Ms. Haskins?

Second, the Haskinses contend that the June 11, 2012 email from Mr. Studnicki confirmed that Ms. Haskins was entitled to the foreign-earned-income exclusion. Although Mr. Studnicki's email discussed the 330-day requirement for the foreign-earned-income exclusion, the email did not say this was the only requirement for claiming the exclusion. There is no reason to think that Mr. Studnicki was qualified to give tax advice anyway. The Haskinses have not proven that the exchange of emails in June 2012 justifies the conclusion that Ms. Haskins made a reasonable attempt to comply with the provisions of section 911.

Third, the Haskinses contend that, when Ms. Haskins used the website taxslayer.com in October 2012 to prepare the 2011 return, the website asked her questions about her eligibility to claim the foreign-earned-income exclusion and determined that she was eligible. Yet Ms. Haskins did not say what questions were posed by the website, what answers she gave in response, or what specific advice the website supplied. Furthermore, the record does not reveal whether she was communicating with an actual person or with an automated process. The Haskinses have not proven that the communications Ms. Haskins had with the

**[*44]** taxslayer.com website justify the conclusion that she made a reasonable attempt to comply with the requirements of section 911.

Fourth, Ms. Haskins claimed that she knew other contractors in Afghanistan who had claimed the foreign-earned-income exclusion on their returns and were not audited. This factual claim is made on brief and is not supported by the record. We do not consider it. See Bialo v. Commissioner, 88 T.C. 1132, 1140 (1987).

Reliance on professional advice may constitute reasonable cause and good faith. Sec. 1.6664-1(b)(1), Income Tax Regs. However, none of the communications discussed above (i.e., the advice given at the SAIC tax briefing, the email from Mr. Studnicki, and the communications from taxslayer.com) meets the three tests for reliability as professional advice. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 99. First, the Haskinses did not prove that any of the communications were made by a knowledgeable, experienced adviser. Second, the Haskinses did not prove that they gave all the information necessary to evaluate entitlement to the foreign-earned-income exclusion. Third, they did not prove that anyone actually arrived at the judgment or gave the opinion that Ms. Haskins was entitled to the foreign-earned-income exclusion.

[*45] The Haskinses argue that Ms. Haskins did not have access to a real tax professional when she prepared the 2011 return because she was in Afghanistan. Ms. Haskins was in Afghanistan from October 2011 to November 2012. This period includes October 2012 when she prepared the 2011 return. However, Ms. Haskins was in the United States in 2013 when she prepared the 2012 return. Ms. Haskins did not consult a tax professional regarding the 2012 return. Nor did she do any research on her own to determine whether she was entitled to the foreign-earned-income exclusion. As she credibly testified: "[I]t was not until I received the notice from the IRS saying I did not meet the requirements, that I started doing research to find out what the actual requirements were."

Thus, Ms. Haskins did not get professional advice on the matter. Nor did she do research herself.

The Haskinses did not have reasonable cause for, or act in good faith with respect to, claiming the foreign-earned-income exclusion. Therefore they did not have reasonable cause for, or act in good faith with respect to, the portion of the underpayment corresponding to their claim of the foreign-earned-income exclusion. As we previously observed, the Haskinses do not argue that they had reasonable cause for, or acted in good faith with respect to, any other portions of the underpayment.

**[*46]** The Haskinses are liable for the accuracy-related penalty under section 6662(a) for 2012 to the extent there was a substantial understatement of income tax for that year.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.